UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| MICHAEL D. MAYS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:08-CV-93 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Michael D. Mays, who is proceeding *pro se*, appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Mays applied for DIB on March 8, 2004, and for SSI on February 9, 2004, alleging that he became disabled as of June 25, 2003. (Tr. 18, 51-53.) The Commissioner denied his application initially and upon reconsideration. (Tr. 28-30.) On August 22, 2006, Administrative Law Judge (ALJ) John S. Pope conducted a hearing at which Mays, who appeared *pro se*, and a vocational expert ("VE") testified. (Tr. 154-83.) On June 26, 2007, the ALJ rendered an unfavorable decision to Mays. (Tr. 18-27.) Mays submitted a request for review to the Appeals

---

[1]All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

Council, which the Appeals Council denied (Tr. 5-7, 11), making the ALJ's decision the final decision of the Commissioner.

Mays filed a *pro se* complaint with this Court on April 10, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.) Mays's mother filed his opening brief (Docket #12), which the Commissioner moved to strike (Docket # 15). Following a court order, Mays filed his own briefs in response to the Commissioner's motion. (Docket # 17.) The Court denied the Commissioner's motion and construed Mays's response as a supplemental opening brief. (Docket # 18.) The Commissioner filed his response and Mays replied, making the matter ripe for decision. (Docket ## 19, 20.) As far as can be discerned from Mays's briefs, he argues that the ALJ improperly assessed his credibility, and that the Appeals Council should have reviewed his case in light of new evidence of a leg injury. (Pl. First Br. 1-2. Pl.'s Second Br. 1-2.)

## II. FACTUAL BACKGROUND[2]

### A. General Background

Mays was forty one years old at the time of the ALJ's decision. (*See* Tr. 51.) He has a high school education. (Tr. 61.) In 1984, Mays fell from a four-story building, breaking his leg, ankle, and wrist; compressing the vertebrae in his back; and causing him to undergo surgery on his ankle, back, and wrist. (Tr. 58-59, 165-66.) He subsequently returned to work, and was employed as a factory worker, performing heavy unskilled work, from 1993 to September 2001. (Tr. 55, 68, 107, 164.) In his Disability Report, he alleged disability due to "total fusion of right ankle[,] limited movement of right wrist[,] compressed lumbar vertebr[ae]s

---

[2] The administrative record in this case is 183 pages, and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

2

causing failed back syndrome[.]" (Tr. 55.)

## B. *Summary of Relevant Medical Evidence*

Mays underwent ankle fusion surgeries in 1995 and 2000 with Dr. Scott Karr at Surgery One, Inc. (Tr. 115, 144.) Then, in September 2001, Mays re-injured his back while on the job, attempting to pick up an eighty pound bag. (Tr. 55.) Ultimately, on January 14, 2003, Mays saw Dr. Robert Gould, also of Surgery One, for epidural steroid injections in his back. (Tr. 114, 124-25.) Dr. Gould noted that there was radiographic evidence of multi-level stenosis and degenerative disc disease. (Tr. 124.) Two weeks later, Mays reported to Dr. Gould that the injections provided no relief. (Tr. 123.) Dr. Gould indicated that the various conservative treatments they tried have failed to relieve Mays's pain, and that Mays did not want to pursue narcotics because he had abused them in the past. (Tr. 123.)

Dr. Gould referred Mays to Dr. Deborah Coates, a pain management specialist. (Tr. 122-23.) On January 29, 2003, Dr. Coates indicated that an MRI of Mays's lower back showed an old compression fracture at L3-4 with forty percent loss of disc height, as well as two bulging discs, both with mild neural encroachment. (Tr. 122.) Mays informed Dr. Coates that he had not obtained relief from the epidural injections, medication, or physical therapy, and that activity worsened his pain. (Tr. 122.) He indicated his desire to avoid narcotics, and Dr. Coates noted that she was uncomfortable with his statement that he was taking ten Advil per day for pain relief. (Tr. 122.) A physical examination revealed tenderness in his lower back, but no tenderness, swelling or atrophy in his arms or legs. (Tr. 122.) His sensation was intact. (Tr. 122.) Dr. Coates recommended facet injections in his lower back. (Tr. 122.)

Mays returned to Dr. Gould on November 10, 2003, reporting problems with falling as of

November 2002, and that he used to fall more often but obtained a standard cane, which helped. (Tr. 121.) Dr. Gould wrote that Mays "is also in the process of applying for disability and needs this letter specifically for that." (Tr. 121.) Mays reiterated that he did not want to take any medication because of his history of narcotic use. (Tr. 121.) Dr. Gould's impression was failed back syndrome, radiculopathy, and "[n]early one year history of falls[,]" and he prescribed a quad cane to improve his balance. (Tr. 121.)

Dr. Jaya Karnani performed a consultative physical examination of Mays on May 22, 2004, for the agency. (Tr. 128-31.) She noted Mays's prior ankle fusion operations, that he complained of experiencing pain when walking more than one to two blocks, and that he had tingling and numbness which medicine did not relieve. (Tr. 128.) Mays reported daily pain causing him to change positions constantly, that he sometimes falls when not sitting, and that any activity causes back problems. (Tr. 128.)

A physical examination revealed that Mays struggled with getting on and off the examination table. (Tr. 128.) Testing showed that he had reduced range of motion in his upper and lower back, both shoulders, both knees, and both hips. (Tr. 131.) He had no range of motion in his right ankle. (Tr. 130, 131.) Dr. Karnani reported that Mays's gait and station were unstable and unsteady without an assistive device, but that with the cane his stability, steadiness, and speed improved. (Tr. 129.) She opined that Mays would not be able to stand or walk for two hours in an eight-hour day. (Tr. 129.) The neurological examination was normal. (Tr. 129.) Dr. Karnani's impression was that Mays had pain in his right ankle secondary to fusion with significantly decreased range of motion and pain on walking, and back pain secondary to possible spinal stenosis and herniated disc. (Tr. 129.) She wrote that Mays "has pain with

4

almost all movement and has acute exacerbation of pain throughout the day." (Tr. 130.) She also stated that he had difficulty standing for more than half an hour at a time, difficulty walking for more than one to two blocks, and difficulty lifting and carrying more than twenty to thirty pounds. (Tr. 129-30.) However, she added that she did not believe he would have difficulty sitting or handling objects. (Tr. 130.)

Dr. J. Sands reviewed the evidence for the Indiana Disability Determination Service on June 14, 2004. (Tr. 132-39.) Dr. Sands concluded that Mays could lift twenty pounds occasionally and ten pounds frequently. (Tr. 133.) He also found that Mays could sit for six hours in an eight-hour work day, and that he could stand and/or walk for at least two hours in an eight-hour work day but a "medically required hand-held assistive device is necessary for ambulation." (Tr. 133.) Dr. Sands also concluded that Mays could never climb ladders, ropes, or scaffolds; could occasionally climb stairs; and occasionally engage in postural activities. (Tr. 134.) He further found that Dr. Karnani's statements about Mays's limitations were not supported by the medical evidence of record. (Tr. 138.) Dr. A. Dobson reviewed the evidence on August 16, 2004, and affirmed Dr. Sands's conclusions. (Tr. 139.)

On August 17, 2006, Mays sought treatment from J. Patel, M.D., for depression. (Tr. 142-43.) Mays reported that he had not done anything outside his home for three years, that he does not sleep well, and that he takes as many as fifty Advil tablets a day for back pain. (Tr. 142-43.) He explained that he previously was addicted to prescription medication but later realized he had to take himself off it. (Tr. 142.) Dr. Patel noted that he was "walking with a cane, [was] quite overweight, and cannot lose weight." (Tr. 142.) A mental status examination revealed that Mays was alert, oriented, and cooperative. (Tr. 143.) Dr. Patel's impression was

5

major depression and dysthymia, and Mays's Global Assessment of Functioning (GAF) score was 45.[3] Dr. Patel prescribed Cymbalta for depression and back pain, but noted that Mays had no money to purchase medicine, so he gave him samples. (Tr. 143.) The doctor also recommended counseling but noted that Mays "has no means to pay because he has no income." (Tr. 143.) Dr. Patel wrote, "This gentleman can hardly stand and hardly can walk. There is no way that he can find a job, which he can support himself. He is not capable to engage in gainful employment. He cannot even focus and concentrate just because he has a constant pain [sic]." (Tr. 143.)

On August 6, 2007, two months after the ALJ issued his decision but prior to the Appeals Council's denial of request for review, Mays returned to Dr. Karr complaining of worsening right ankle pain, rating it an eight out of ten on a subjective pain scale.[4] (Tr. 144-45.) Dr. Karr noted swelling in his ankle and slight instability. (Tr. 144.) The doctor indicated that Mays had not taken any medication or engaged in a formal exercise program for this condition. (Tr. 144.) An x-ray of the ankle revealed that the surgical fusion was well-fixed and there was no spurring at the operative site, but there was a fibular nonunion.[5] (Tr. 144.) Dr. Karr's impression was

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.* And, a GAF score of 71 to 80 reflects that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors" and indicates "no more than slight impairment in social, occupation, or school functioning." *Id.*

[4] The Appeals Council received the medical record pertaining to this visit, and made it part of the administrative record. (Tr. 8.)

[5] The fibula is the "lateral and smaller of the two bones of the leg[.]" STEDMAN'S MEDICAL DICTIONARY 727 (28th ed. 2006). Nonunion means "[f]ailure of normal healing of a fractured bone." *Id.* at 1330.

fracture nonunion and "mononeuritis/par lower limb." (Tr. 144.) He suggested surgery on the area of non-union and to cut one of the ankle nerves, but indicated that some of Mays's pain reflected arthritic changes which would be difficult to address surgically. (Tr. 145.)

## C. Hearing Testimony

Mays testified that he lives in his parents' home. (Tr. 162.) He explained that he stopped working in September 2001 because he re-injured his back picking up a bag while on the job at a fiberglass plant. (Tr. 163-65.) Mays testified that he has no movement in his right ankle, that he has a bad back from his fall from a four-story building in 1984, and that his knees and limbs are aggravated for compensating for his injuries throughout the years. (Tr. 165-66.) He stated that he could not walk far, nor stand or sit for very long; he no longer attempted to lift or carry anything because of his back pain but estimated he could lift between five and ten pounds. (Tr. 166, 176.) He explained that he last saw a doctor for his physical conditions over a year prior to the hearing, who gave him injections and told him there was nothing else that could be done. (Tr. 167.) Mays also stated that he refuses to take any narcotic medications because he became addicted to them after his fall, and that now he only takes Advil for pain. (Tr. 168-69.)

When asked if his doctors put restrictions on his physical activities, he said that Dr. Karr, his surgeon, told him "I should quit being on my feet and take a desk job . . . [,]" and that Dr. Gould instructed him not to sit or stand for too long. (Tr. 169.) Mays described his pain, stating that for about half of every day, he experiences a burning pain radiating from his left shoulder down his back, through his right hip, and into his right leg; he also experiences constant right ankle pain. (Tr. 174-75.) He explained that he could avoid pain only by staying off his feet. (Tr. 174.) According to Mays, he could walk for "maybe" two hours in an eight-hour work day,

7

stand for forty-five minutes to an hour, and sit for an hour and a half. (Tr. 176.) He also informed that his doctor prescribed a cane because his right leg sometimes becomes numb and causes him to fall. (Tr. 177.)

Mr. Mays added that when he wakes up in the morning, he takes some Advil and then lies down again until the pain subsides. (Tr. 170.) He then eats breakfast and usually remains in his room, sitting or lying down and watching television, until dinner. (Tr. 170.) After dinner he returns to his room to retire for the night. (Tr. 171.) He indicated that he is able to dress himself but only takes three showers a week because of the pain. (Tr. 171.) He also reported that he can make himself simple meals but does not go to the grocery store or do any chores. (Tr. 171.) He affirmed that he has a driver's license without restrictions. (Tr. 162.)

When asked about his mental health treatment, Mays stated that he began seeing Dr. Patel only about a week and a half before the hearing. (Tr. 172.) Mays said that Dr. Patel diagnosed him with depression and prescribed him Cymbalta, but it made him sick. (Tr. 169-73.) He also stated that he gave up all his hobbies and outside activities, does not exercise, and does not belong to a church or any social organization. (Tr. 172-73.) When asked if he sees any people other than those he lives with, he stated that once every month and a half to two months some family members stop by the house and come up to his room to visit with him. (Tr. 173.)

A VE also testified at the hearing. In response to a hypothetical the ALJ posed, the VE testified that a person of Mays's age, education, experience, and work background, who was limited to sedentary work, needed to work primarily from a seated position, and could sit for half an hour at a time but needed to be able to stand when necessary, could perform approximately 4,000 unskilled jobs in the northern Indiana region, including addresser (175 jobs), order clerk

(300 jobs), and semiconductor packer (175 jobs). (Tr. 179-80.) The VE also testified that if the individual needed to use a cane when standing, there would be about 500 jobs in the region that he could perform, including the order clerk job. (Tr. 180-81.) The VE further indicated that if all of Mays's assertions were credible, there would be no work he could perform. (Tr. 181.)

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

9

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

10

Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On June 26, 2007, the ALJ rendered his opinion. (Tr. 18-27.) He found at step one of the five-step analysis that Mays had not engaged in substantial gainful activity since his alleged onset date and at step two that his back disorder, fused right ankle, and obesity were severe impairments. (Tr. 20.) At step three, he determined that Mays's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 20-21.) Before proceeding to step four, the ALJ determined that Mays had the following RFC:

> [T]he claimant retains the [RFC] to tolerate at least a wide range of light work. However, in viewing the evidence in a light most favorable to the claimant, and giving him the benefit of the doubt, the undersigned concludes that he retains the [RFC] for sedentary work. As such, the claimant can perform at employment that does not require lifting/carrying in excess of 5 (frequently) to 10 (occasionally) pounds. However, any lifting and carrying would have to be able to be performed from a seated position. The claimant can perform at employment that does not require sitting in excess of two hours over the course of a normal eight hour workday. The claimant can perform at employment that does not require standing or walking in excess of two hours over the course of a normal eight hour workday. The claimant can perform at employment that permits sitting for at least ½ at a time [sic] with the ability to stand when necessary.[7]

(Tr. 21.)

Based on this RFC, the ALJ concluded at step four that Mays could not perform his past relevant work as a factory worker. (Tr. 25.) At step five, he concluded that based on an RFC for the full range of sedentary work, and considering Mays's age, education, and work experience, a finding of "not disabled" is directed by the Medical-Vocational guidelines ("the Grid"). (Tr. 26.) Therefore, Mays's claims for DIB and SSI were denied. (Tr. 26.)

---

[7] It is clear from the ALJ's hypothetical to the VE that he meant that Mays could perform at employment permitting sitting for at least one half *hour* at a time. (*See* Tr. 181.)

## C. The ALJ Improperly Evaluated Mays's Credibility

Mays's *pro se* brief highlights some issues bearing on the ALJ's credibility determination. The ALJ, in fact, discredited Mays's pain allegations on a variety of bases, including his past ability to perform physical labor, a lack of objective medical evidence, his treatment history, his activities of daily living, and inconsistent statements. Some of this reasoning, however, is significantly flawed, ultimately requiring a remand.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

1. <u>The ALJ failed to follow the requirements of SSR 96-7p in evaluating Mays's treatment history.</u>

Mays's treatment history weighed heavily in the ALJ's determination. The ALJ suggested no less than four times that Mays's problems are not as debilitating as alleged because he was able to control his pain with over-the-counter medication and he did not seek medical treatment for alleged injuries. (*See, e.g,* Tr. 22, 23, 25.) In arriving at this determination,

however, the ALJ failed to follow the requirements of SSR 96-7p. In particular, the ALJ discredited Mays's allegations of pain on the basis that he only treated it with over-the-counter medications, without considering Mays's explanation that he seeks to avoid becoming re-addicted to them. Furthermore, the ALJ unfairly failed to take into account Mays's inability to afford treatment.

Social Security Ruling 96-7p provides that "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints[.]" However, it further cautions that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment *without first considering any explanations that the individual may provide*, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p (emphasis added); *see also Moss v. Astrue*, __ F.3d __, 2009 WL 33546, at *5 (7th Cir. 2009) ("And while infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding, we have emphasized that 'the ALJ must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care.'" (quoting *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (internal quotation marks and citation omitted)); *Dominguese v. Massanari*, 172 F. Supp. 2d 1087, 1097 (E.D. Wis. 2001).

In arriving at his credibility determination, the ALJ reasoned, "The undersigned has noted that the claimant is presently only taking over-the-counter analgesics. Therefore, it is difficult to make an argument for intractable pain symptoms." (Tr. 22; *see also* Tr. 23 ("[I]t appears that [Mays's] over-the-counter analgesic does at least an adequate job of controlling his

pain.")".)

However, there are numerous references in the record to Mays's reasoning for only taking non-prescription medication for pain relief: he previously was addicted to narcotic pain medications and wants to avoid re-addiction. (*See, e.g,* Tr. 121-23, 142.) Mays also testified to such at the administrative hearing. (Tr. 168.) Nevertheless, the ALJ partly discounted Mays's pain allegations without a single mention of the reason, or an evaluation of why it should not be credited. *See, e.g., Moss*, 2009 WL 33546, at *5 (finding an ALJ's credibility determination erroneous in part because the ALJ did not seek an explanation for the lack of medical findings addressing the claimant's need for a cane); *Villano v. Astrue*, __ F.3d __, 2009 WL 196550, at *3 (7th Cir. 2009) (finding error where "the ALJ did not mention [the claimant's] testimony about the frequent crying spells she said she suffered as a result of her depression, and *he should have at least explained whether and why he found that testimony credible or not credible*, given her diagnoses of depression and related psychological problems") (emphasis added)).

Furthermore, the ALJ overlooked two distinct doctors' notations reporting that Mays was taking an exceedingly high dosage of Advil for his pain. (*See* Tr. 122, 142.) In fact, Dr. Coates stated that she was "not comfortable with the fact that he is taking ten Advil a day . . . ." (Tr. 122.) That Mays was taking disconcertingly high doses of Advil suggests that it was not adequately controlling his symptoms. Thus, the ALJ's reasoning that Mays's "over-the-counter analgesic does at least an adequate job of controlling his pain" (Tr. 23) fails to build an adequate bridge from the evidence to his conclusion. *See Villano*, 2009 WL 196550, at *2 ("The ALJ is not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion.") (citations omitted).

The ALJ *similarly erred* in a portion of his analysis discrediting Mays's allegations of problems with stability. The ALJ reasoned,

> While the claimant alleges a history of frequent falls, there is no objective evidence to support those claims, e.g., any evidence of a fall significant enough to require medical attention. While the claimant also alleges the need for a cane for ambulation, it is interesting to note that this issue did not come about until the claimant arrived [a]t [O]rthopedics Northeast requesting documentation to support a prior claim for disability back in 2002. Furthermore, there is no indication within the documentary evidence of record that the claimant's surgical hardware in the right ankle is misaligned. There is also no recent evidence of the claimant arriving for any appointments with a cane.

(Tr. 23 (citations omitted).)[8]

Mays argues that he has been injured due to his falls but he has been unable to seek treatment as a result of lack of finances. Indeed, "[a]n inability to afford treatment is one reason that can 'provide insight into the individual's credibility.'" *Craft*, 539 F.3d at 679 (quoting SSR 96-7p).

Mays testified at the hearing that he has problems with falling and, as a result, relies on a cane that Dr. Gould prescribed. (Tr. 176-77.) Significantly, however, the ALJ did not question Mays about why he did not pursue regular treatment for his falls, even though the record reflects Mays's problems affording treatment. For example, Dr. Patel explained that Mays had "no money to buy any medicine" and she provided him with Cymbalta samples instead. (Tr. 143; *see also* Tr. 100 (Mays indicating on an Adult Disability Report that he has not seen any doctors for new problems because he "can't afford to").) The ALJ's error is therefore twofold. He not only failed to question Mays about his lack of treatment before discrediting his allegations about

---

[8] The ALJ again noted Mays's lack of treatment further on in the credibility analysis, finding that Mays exaggerated his claims since Dr. Gould's records during the relevant period do not indicate treatment for frequent falling. (Tr. 25.)

15

frequent falling; he also failed to evaluate the evidence of Mays's possible reason or otherwise indicate that he contemplated it. Consequently, the ALJ improperly drew a negative inference about Mays's testimony. *See Craft*, 539 F.3d at 679; *Moss*, 2009 WL 33546, at *5.

The Court also finds another aspect of this analysis troubling. The ALJ further rejected Mays's allegations that he needs a cane to walk and stand on the basis that "[t]here is also no recent evidence of the claimant arriving for any appointments with a cane." (Tr. 23.) This statement overlooks the fact that Dr. Karnani, the consultative physician, specifically noted that Mays's gait and station were "unstable and unsteady" without an assistive device, and that his stability, steadiness, and speed improved with a cane. (Tr. 129.) Furthermore, Dr. Patel explicitly stated that Mays "is walking with a cane[.]" (Tr. 142.) Consequently the ALJ's reasoning seemingly misconstrues the evidence of Mays's use of a cane when attending his appointments.[9]

It is the ALJ's responsibility to articulate his analysis of the evidence, at least at some minimal level, to allow the Court to trace his path of reasoning and to be assured that he considered the important evidence. *Villano*, 2009 WL 196550, at * 2 ("If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded.") (collecting cases). In this instance, it is not clear that the ALJ considered all the important evidence in arriving at his determination.

2. <u>The ALJ erroneously evaluated some of the objective medical evidence.</u>

The ALJ arrived at a negative credibility determination in large part due to his conclusion

---

[9] In addition, the ALJ's rejection of Mays's allegation that he needs a cane seems conclusory, given that the agency physicians who reviewed the record found that a "medically required hand-held assistive device is necessary for ambulation." (Tr. 133.)

16

that the objective medical evidence did not substantiate Mays's allegations about his pain. Indeed, the ALJ's findings contained several examples of how the ALJ believed the evidence, or lack thereof, was unsupportive of Mays's claims. (*See, e.g.,* Tr. 22-23, 25.) Although the ALJ engaged in a lengthy review of the medical record, he improperly evaluated some of the evidence, further demonstrating the propriety of a remand in this instance.

For example, the ALJ improperly discredited Mays's allegations that physical therapy was ineffective based upon the unfounded conclusion that Mays could lose weight to relieve pressure on his back and extremities. In so finding, the ALJ noted evidence of Mays's back injuries and then reasoned,

> While the claimant testified that his physical therapy provided him with no relief [sic]. However, the undersigned does understand that the claimant has gained quite a bit of weight since 1984. Treatment notes from 1986 list his weight at 150 pounds (Exhibit 7-F/49). At the hearing he said that he weighed 240 pounds. However, there is no indication that the claimant's weight is other than exogenous (Exhibits B-1F through B-6F). While the undersigned is aware that the claimant is not as active as he used to be due to the ankle, he does have the option of reducing his caloric intake in order to lessen the pressure on his lower extremities and back. While losing weight is something millions of Americans struggle with, in the absence of a significant glandular impairment, weight loss, while difficult, is possible. As such, this is a problem within the claimant's control.

(Tr. 21-22.)

This analysis is troubling because "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (collecting cases). Here, however, the ALJ cited to no physician's opinion suggesting that Mays may safely lose significant weight simply by lowering his caloric intake, or to any records indicating that physical therapy would become helpful if he did lose weight. Therefore, the ALJ impermissibly played doctor in concluding that Mays's weight problem is

17

within his control, and, as a consequence, improperly discredited Mays's allegations about the efficacy of his physical therapy. *See, e.g., Parris v. Barnhart*, No. 03 C 0251, 2004 WL 3008744, at *13 (N.D. Ill. Dec. 28, 2004) (remanding a credibility determination in part because the ALJ played doctor in evaluating a claimant's allegations of balance problems); *Woolridge v. Barnhart*, No. 03 C 0105, 2004 WL 2066918, at *6 (N.D. Ill. Sept. 8, 2004) (remanding a credibility determination partially on the basis that the ALJ played doctor in discrediting the claimant's hearing testimony).

Moreover, the ALJ also erred in his evaluation of Mays's allegations that his pain increases with activity and he does not exercise. The ALJ reasoned,

> The claimant testified to having no hobbies or activities that he enjoys doing and that he does not exercise. However, there is no clinical evidence that suggests that his lack of activity is out of necessity. As such, it appears that his allegations may have been exaggerated.
>
> In fact range of motion testing from May 2004 revealed nearly full range of motion with respect to internal and external rotation of the hips. While flexion of the right hip was only half of what was expected[,] flexion of the left hip was virtually full.

(Tr. 22 (internal citations omitted).) Then, further on in the opinion, the ALJ again concluded "[T]here is no clinical documentary evidence to suggest or imply that the claimant has suffered from [a variety of ailments, including] significant range of motion deficits . . . ." (Tr. 23.)

The problem with this analysis is that it overlooks the other results of Mays's range of motion testing revealing limited range of motion. In fact, Dr. Karnani wrote that Mays had "difficulty in doing most ROM exercises" and "*significantly* decreased ROM" in his fused ankle, and she recorded reduced range of motion of Mays's cervical and lumbar spine, shoulder, and knee. (Tr. 128, 130-31 (emphasis added).) Thus, it appears that the ALJ selectively reviewed

18

this evidence when discounting Mays's allegations of limited activity. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (emphasizing that an ALJ must not ignore evidence which contradicts his opinion, but must evaluate the record fairly); *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) (articulating that an ALJ "must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position").

In sum, when arriving at his credibility determination, the ALJ relied heavily upon Mays's lack of treatment and what he perceived as a lack of objective medical evidence supporting the claims of debilitating pain. The VE testified that if the ALJ were to entirely credit Mays's allegations, there would be no work he could perform. (Tr. 181.) Thus, the ALJ's failure to follow Social Security Ruling 96-7p and his inadequate evaluation of some of the medical evidence cannot be definitively viewed as harmless in this instance. *See Craft*, 539 F.3d at 678-80 (7th Cir. 2008) (remanding the ALJ's decision where two of three reasons that the ALJ listed for his credibility determination were faulty); *Wadsworth v. Astrue*, No. 1:07-cv-0832-DFH-TAB, 2008 WL 2857326, at *9 (S.D. Ind. July 21, 2008) (concluding that the ALJ's failure to consider the plaintiff's explanation for not seeking medical treatment on a regular basis was not a harmless error, even though the ALJ provided "a detailed series of reasons for his finding"); *cf. Krontz v. Barnhart*, No. Civ. 1:01CV322, 2002 WL 32072796, at *9 (N.D. Ind. Mar. 26, 2002) (affirming the ALJ's decision where the plaintiff's failure to follow treatment was "simply an additional factor in the ALJ's credibility assessment" and the ALJ's credibility assessment did not "rest" on it).

Accordingly, the case will be remanded so that the ALJ may reassess the credibility of Mays's complaints in accordance with Social Security Ruling 96-7p. *See Brindisi*, 315 F.3d at

19

787 ("In evaluating the credibility of statements supporting a Social Security application, we have noted that an ALJ must comply with the requirements of Social Security Ruling 96-7p.").[10]

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion. The Clerk is directed to enter a judgment in favor of Mays and against the Commissioner.

SO ORDERED.

Enter for this 26th day of February, 2009.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[10] Mays's brief also discussed his broken leg, seemingly arguing that the Appeals Council should have reviewed his case in light of Dr. Karr's new report. *See* 20 C.F.R. § 404.970(b); *see, e.g., Getch v. Astrue*, 539 F.3d 473 (7th Cir. 2008) (setting forth the standard of review of the Appeals Council's decision not to review a case based on new evidence). However, because the Court is already remanding the case on the ALJ's evaluation of Mays's credibility, the Court will not reach the issue of whether a remand is appropriate on that basis.

Furthermore, as the Commissioner's brief noted, there is a discrepancy with the ALJ's step five determination. (Resp. Br. 9.) Although the ALJ's RFC determination was not for the full range for sedentary work, the ALJ concluded at step five that the Grids directed a finding of not disabled, based on an RFC for the full range of sedentary work and considering Mays's age, education, and work experience. (Tr. 26.) Thus, it appears that the ALJ misapplied the Grids to direct a finding of not disabled. *See* SSR 96-9p ("Where there is more than a slight impact on the individual's ability to perform the full range of sedentary work, if the adjudicator finds that the individual is able to do other work, *the adjudicator must cite examples of occupations or jobs* the individual can do *and provide a statement of the incidence* of such work in the region where the individual resides or in several regions of the country.") (emphasis added).

The Commissioner argues that any error in the step five determination was harmless because the ALJ heard testimony from a VE that a significant number of jobs exist for a hypothetical individual with Mays's RFC. Indeed, the ALJ may use reliable VE testimony to meet its burden. *See, e.g.*, *Herron v. Shalala*, 19 F.3d 329, 336-37 (7th Cir. 1994) ("The use of the grid is inappropriate where the claimant's nonexertional impairments are so severe as to limit the range of work he can perform. In such a case, a determination of disability is made through the testimony of vocational experts who can indicate what work, if any, the claimant is capable of performing."). Nevertheless, it would be prudent for the Commissioner to correct this discrepancy on remand.